PORTH *v.* CADILLAC MOTOR CAR CO.

1. COMPROMISE AND SETTLEMENT—RELEASE—PERSONAL INJURIES—
FRAUD—QUESTION FOR JURY.

In an action to recover for personal injuries in which the
defense set up was a complete settlement and release, and
the testimony was in conflict, it was a question for the
jury as to the terms of the contract and whether the
release was procured by fraud from plaintiff, he claiming
that he thought it was a receipt for money paid under
the contract, as he was assured by a representative of
defendant and of the insurance company.

2. SAME—FRAUD—EVIDENCE—BURDEN OF PROOF.

One signing a release of damages for personal injuries is
presumed to have executed it understandingly, and *prima
facie* it must be taken as truly stating the agreement of
the parties, and the burden of proof is upon him not only
to show by a preponderance of evidence that it is not
true, but that he was fraudulently deceived and misled
by what was done and said into believing that he was
signing a mere receipt for money paid under a contract
different from that stated in it.

3. SAME—RELEASE—AVOIDANCE—TENDER.

If the contract under which the money was paid to plaintiff
was limited to his loss of time, extra expenses and total
incapacity for a year following the time it was entered
into, with the matter of full compensation left open,
owing to the uncertainty at that time of the permanency
of the injuries and the extent of possible recovery, and
plaintiff affirmed the contract, he was under no obligation
to return the money paid in fraudulent settlement of it.[1]

4. MASTER AND SERVANT—SAFE PLACE TO WORK—PERSONAL IN-
JURIES—EVIDENCE—MATERIALITY.

While the doctrine of safe place does not apply where a
carpenter is employed by the owner in constructing a
scaffold to do work on a cupola on a new building, the
steel framework of which had been constructed by an
independent contractor, and was injured as the result of
the falling of the scaffold due to the absence of a bolt

[1] On return of tender of consideration for release of claim for
personal injuries set aside on ground of fraud, see note in 35
L. R. A. (N. S.) 660.

in a steel beam on which the platform rested, yet the fact that he was directed to begin his work on top of a steel structure finished by an independent contractor is material as bearing upon his contributory negligence and the negligence of his employer.

5. SAME—NEGLIGENCE—PERSONAL INJURIES.
Where the owner of the building had knowledge or notice of the absence of the bolt in the beam in the steel framework of the building which caused the injury of the carpenter upon falling of the scaffold, and he neglected to take proper precautions for the protection of the carpenters, he was responsible for the resulting injuries.[1]

6. SAME—EVIDENCE—SUFFICIENCY.
Evidence *held*, sufficient to go to the jury on the question whether a foreman in charge of the carpenters had direct notice of the defect in the steel work so as to bind defendant.

7. TRIAL—INSTRUCTIONS—INTEREST, COMPUTATION OF.
In an action for personal injuries an instruction that if the jury should find for the plaintiff they should deduct the amount already received was confusing and prejudicial, where it would devolve upon the jury to figure interest on the amounts to be deducted and they were uninstructed upon that subject.

Error to Wayne; Cross, J., presiding. Submitted April 11, 1917. (Docket No. 135.) Decided December 27, 1917. Rehearing denied March 28, 1918.

Case by William Porth against the Cadillac Motor Car Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Keena, Lightner, Oxtoby & Hanley*, for appellant.

*Dohany & Dohany*, for appellee.

STEERE, J. Plaintiff was injured on September 16, 1911, while working in defendant's employ as a carpenter on a building in process of construction, by the

---

[1] Authorities discussing the question of knowledge as an element of master's liability to an injured servant, see note in 41 L. R. A. 33.

fall of a scaffold which precipitated him to the ground some 40 feet below.

During the summer season of 1911 defendant was erecting a new factory building about 250 feet long at its Trombley avenue plant in the city of Detroit. Most of the construction work was done by independent contractors, but defendant also had in its own employ a force of carpenters to do certain of the wood work under the supervision of J. W. Butler, who took charge of the carpenter work for defendant as soon as the building was ready for that part of the construction. The Whitehead & Kales Company did the steel construction work under contract, which was early entered upon and had been completed when the accident happened. After its completion the Albrecht Company, which had the masonry contract, installed in the structure a freight hoist with which to carry on its work, and in so doing found it necessary to temporarily remove a small portion of the previously erected steel work, for which permission was obtained from the Whitehead & Kales Company. When through using the hoist at that place the Albrecht Company's employees removed it and replaced the steel work. It was subsequently discovered that at this point one of the bolts used to fasten a steel beam or channel iron where one end of it rested on a truss was left out or not properly replaced. This beam, or channel iron, was at the top of the steel construction on the trusses which supported the roof, in which the carpenters were constructing supports for a cupola. When the accident occurred a force of carpenters, including plaintiff, had just completed a platform or scaffold preparatory to working upon the cupola above it. This was made by placing planks upon the channel irons, or steel beams, including the one which had not been bolted at one end, which it is claimed allowed it to spring in the center with the weight put upon it so as

to withdraw the unbolted end from its bearing on the truss. After the platform, or so-called scaffold, was completed and the men were proceeding to use it in their work plaintiff was the first upon it, and when he reached its center it fell, taking him with it to the ground and seriously injuring him. He was at once removed to Harper hospital and there given proper care and medical attention.

Dr. Stockwell, who was called by defendant at the time of the accident, and attended plaintiff both at the hospital and afterwards at his home, testified that his injuries consisted of a laceration of the lower lip, a comminuted fracture of the middle left radius—one of the bones of the forearm—and fractures with considerable displacement of the *os calcis* bones in both ankles, which he diagnosed in his report as "probable results not good," meaning the injury would be permanent; that there was nothing in the report showing anything wrong with the collar bone, ribs, backbone, or the legs above the feet, and had there been it would have appeared in the chart as he went over the patient looking for all injuries. Dr. Povey, who was sent by plaintiff's attorney to examine him some three years later, testified to finding indications and the effects of those described by Dr. Stockwell and other fractures, including both collar bones, with the right elevated and the left depressed, and the breastbone depressed; that both ankle joints had been fractured and stiffened so that 75 per cent. of the foot motion was lost without hope of recovery; that the spine had been injured and his whole nervous condition upset, and as a result of scar tissue formed in the spinal cord and nerves his whole body was affected with a muscular tremor. While there is a marked variance in the testimony of the physicians as to the extent of plaintiff's injuries, it appears undisputed that they were serious, leaving him permanently crippled and totally incapacitated to

perform the work he was engaged in at the time of the accident.

After remaining in the hospital about eight weeks plaintiff was taken to his home, where Dr. Stockwell continued to attend him professionally until about the middle of the following January. An office employee of the Cadillac Motor Company named Stanley called upon him occasionally at the hospital to see, as he stated, how he was getting along and to take him his regular wages as instructed by his employer. This he continued to do after plaintiff was taken to his home until the latter part of January, when he broached the matter of a settlement with plaintiff and the subject was discussed several times along lines upon which they do not agree, but later Mr. Sawyer, an attorney for the casualty company which insured defendant against loss resulting from injuries to employees, was called in, and their negotiations culminated in some kind of a settlement, the nature of which is in dispute. Under it payment was made to plaintiff of $2,500, less the amount he had already received from defendant, and he signed the following document, for which a printed form was used:

"Release.

"Received of *Cadillac Motor Car Co.* this *27th day of January, 1912,* the sum of *twenty-five hundred ($2,500.00)* dollars, in full satisfaction and discharge of all claims which I now have or may hereafter have on account of all injuries or injurious results, direct or indirect, arising or to arise from an accident sustained by me on or about the *16th* day of *September, 1911,* while in the employment of the above. I am *satisfied with this settlement.*

"*William Porth.*

"Witnesses:
   "*Mrs. Sophie Porth,*
      "Address. *208 30th St.*
   "*E. A. Stanley,*
      "Address. *1343 Cass Ave.*"
(The italicized portions are in writing.)

At this time plaintiff was yet under total disability and in a helpless condition, attended and cared for by his wife and daughter. It is his contention that he was deceived into signing this instrument, supposing it was only a receipt for the money then paid him which, under the agreement they made, covered only damages, losses, and expenses for one year with the matter of final settlement left open. His version of the transaction, supported by the testimony of his wife, is that when first approached on the subject by Stanley he declined to make any offer, not knowing what his future condition would be, but upon being urged to do so he said he would take $10,000 to settle the whole matter if they would pay it then and there would be no further trouble, and never offered to take any less in. full settlement; that as negotiations were pressed from time to time Sawyer finally told him, "The company will allow you $2,000 for the following year," which plaintiff protested was too little; that finally Sawyer and Stanley agreed to pay him and he agreed to accept at that time and for one year $2,500, deducting $287.50 which he had already received from defendant, they assuring him he would be well within a year, agreeing that the matter of a final settlement would be left open to be taken up at the expiration of that time when the result of his injuries could be better determined; that they came the following day and paid the amount agreed upon, presenting a paper for him to sign; that being unable to read he asked Sawyer to read it to him, but he said it was simply a receipt for the money which plaintiff believed and signed without hearing the paper read. His wife, who said she had been to school through the fourth grade and could read, testified that the agreement related only to the first year as she understood it; that Mr. Sawyer said the paper was a receipt and so believing she just glanced it over in part, and after her husband signed

it she, at Sawyer's request, signed as a witness and wrote in the words over her husband's name as Sawyer requested and dictated, "I am satisfied with this settlement;" that her husband never agreed to settle his whole claim for this sum but did at one time say he would be willing to take $2,000 if he could get well as they said he would.

Sawyer and Stanley testified that there were no assurances for the future, or misrepresentations, and the bargain was as the receipt indicates, which was read over to plaintiff before he signed it. Sawyer testified he himself read it to plaintiff, who was very nervous at the time and in bad condition with an injured arm, so "it is very probable that one of us assisted him in writing his name;" that after plaintiff had signed it his wife signed as a witness and then at his (Sawyer's) dictation wrote over her husband's signature his expression of satisfaction with the settlement. What was said, explained, understood, and agreed to on that occasion and prior thereto is in marked dispute.

In October or November of that year plaintiff's physical condition was such that his wife appealed to Stanley for help and he called Dr. Fay, a physician in defendant's employ, to see him. The doctor said an operation would relieve his ankles, but that he was then too weak for such operation and he would treat him at home for a time. Plaintiff testified that Dr. Fay thereafter attended him more or less for about nine months.

In January, 1913, just after the expiration of a year from the date of the receipt in controversy, plaintiff's wife appealed to Stanley for further assistance, and defendant began paying plaintiff, or his wife, $45 per month, which was continued until the following October, when further payment was refused by Mr. Eaton, manager of defendant's welfare department, who had

taken charge of the matter. He testified that the payments made and services rendered by him had nothing to do with any claim for damages, which plaintiff told him were settled, but were an ordinary activity of defendant's welfare department in aid of present or former employees, and after repeated warnings without results they were discontinued because of plaintiff spending the money given for the support of his family in saldons. Plaintiff denies so spending the money, and entirely different reasons are urged in his behalf for said payments.

Defendant's counsel requested the court for a directed verdict on various grounds, especially urging that no original liability on the part of defendant was shown, that if there had been there was a complete settlement and, in any event, plaintiff could not recover because he had not repaid or tendered back the money received and receipted for in full settlement of his claim.

The court submitted the questions of original liability and settlement to the jury as issues of fact, with instructions that in case they found for plaintiff in a greater sum than the amount he had already received, the latter, with interest at 5 per cent. per annum, should be deducted from the former. A general verdict was returned for plaintiff in the "sum of $5,000 over and above the amount of money heretofore received by the said plaintiff from said defendant," and judgment was entered thereon.

Defendant thereafter moved for a new trial contending amongst other reasons that, as shown by his affidavit, the testimony of a witness named Frank Dybalski touching notice given to defendant of the defect, alleged as the only foundation for plaintiff's claim of negligence, was wrongfully interpreted and contrary to the facts as he knew them. Dybalski was one of the carpenters working with plaintiff at the time of

the accident, and still in defendant's employ when this case was tried. He was called for cross-examination by plaintiff under the statute and examined through an interpreter, who was not objected to by defendant. The evident object in calling him was to show that he had notified Butler of the absence of a bolt in the end of the channel iron which fell, and defendant thus had notice of the defect which caused the accident. His testimony, as interpreted, is somewhat contradictory and confusing. The record indicates that counsel for both sides found trouble in getting consistent and responsive answers to their questions through the interpreter. He had answered that he informed Butler two or three days before the accident that the bolt was out; did not remember how many days, nor whether it was just a few minutes before it fell; did not know whether it was out two or three days; he wasn't up there to look; that his partner told him; that he did not know whether it was out two days or three days, etc.; until finally, near the close of his bewildering testimony as interpreted, counsel for defendant, who was examining him, said, "Tell in English what you said"; and he thereupon proceeded, somewhat disjunctively, to describe in English the situation shortly before the accident and said: "Then I told the foreman that place over there had no bolt in one end. He says, 'All right, never mind, they are going to be fixed.' That is what I know." His affidavit in support of the motion for a new trial was also taken through the interpreter and is, like his interpreted testimony, inconsistent in some respects. He however repeats that he saw the bolt was out and notified Butler of it.

Counsel for appellant state in their brief, as a major premise, that "Porth necessarily is seeking to avoid the contract of January 27, 1912;" assert that it was a contract of settlement in full, as evidenced by the pa-

per he signed, and contend that he can only repudiate the settlement and bring this action on the ground of mutual mistake or fraud, in which case return or tender of the amount paid is a prerequisite.

Plaintiff's repudiation is only directed to the paper he signed. Both parties say a contract was entered into shortly before this paper was signed, and that it was executed in full. Neither claims any fraud or mistake as to it. Their disagreement is as to its scope and terms. Plaintiff does not seek to repudiate the contract he claims was made, but contends it was limited to his loss of time, extra expenses, and total incapacity for a year following the time it was entered into, with the matter of full or further compensation left open, owing to the uncertainty at that time as to the permanency of his injuries and the extent to which he would recover; while defendant claims the contract was a full and complete settlement, just as the receipt signed by him shows. He only claims fraud as to the paper he signed—that advantage was taken of his ignorance, inability to read, and confidence in Stanley and Sawyer, at whose request he signed the paper then produced under the assurance that it was only a receipt for the money they had just paid him according to the terms of the oral agreement, as he asserts it was made. The testimony of the witnesses is clearly in marked conflict both as to this and the terms of the contract to which it related. In such case it is not for the court to pass upon the probability of his story or the credibility of the witnesses, for his testimony, taken as true and viewed in the aspect most favorable to his contention, raises issues of fact for a jury both as to whether he was fraudulently deceived into signing the paper in question and the terms of the contract then entered into. Of a release given under a somewhat analogous contention, it was said in *O'Neil* v. *Iron Co.*, 63 Mich. 690 (30 N. W. 688):

"It is not the intention, but the effect upon the plaintiff of what was said and done at the time the paper was signed, that is material here; for if the effect was to lead him to believe that he was signing a mere receipt, and call his attention away from the fact that he was signing so important a paper as an agreement for a release of defendant from liability, the result would be the same—he was deceived as to the true character of the paper he was signing. He testifies that he did not know that he was signing, and did not intend to sign, an agreement to release defendant from liability arising from its negligence."

Plaintiff admits that he signed this release in the presence of his wife and the other witnesses, and received the amount there stated in payment for damages resulting to him from his injuries. He is presumed to have signed it understandingly, and *prima facie* it must be taken as truly stating their agreement. The burden of proof is upon him not only to show by a preponderance of evidence that it is not true, but that he was fraudulently deceived and misled by what was done and said into believing that he was signing a mere receipt for the money paid under a contract different from that stated in it. If the contract was as he claims, and which he does not repudiate but affirms, we see no obligation resting upon him to return the money paid in settlement of it, as would be the case where a party seeking to repudiate a contract admittedly made claims he was fraudulently induced to so agree. Failing to prove by a preponderance of evidence that the contract was not as plaintiff's witnesses testify and the paper he signed shows, he of course could not recover.

Plaintiff's counsel urge that it was the duty of defendant at its peril to provide him with a reasonably safe place in which to work, and that its negligence is also shown by the fact that it had actual notice of the defect which made the place particularly dangerous,

but disregarded it. Defendant contends that as plaintiff was engaged in constructing a scaffold to facilitate his work on an unfinished building, when injured, he assumed the risk, and the doctrine of safe place does not apply under the ruling in *Hoar* v. *Merritt*, 62 Mich. 386 (29 N. W. 15) ; *Dewey* v. *Parke, Davis & Co.*, 76 Mich. 631 (43 N. W. 644), and other so-called scaffold cases in which it is held that the rule of safe place is not applicable.

It is to be noted that plaintiff and his fellow workmen had no part in constructing the steel frame of the building on which they were laying the plank for the floor, or so-called scaffold, from which to do the wood work above. The steel construction they were starting to use had been finished some time before by an independent contractor, as Butler testified. For the purpose of beginning the wood work in the roof defendant had accepted that steel work as done and ordered its carpenters upon it. While the rule of safe place as generally understood cannot be applied as the controlling principle in this case where plaintiff's employment was in the erection of a new building, or construction work which in its progress necessarily undergoes frequent changes and involves extra risks which he is presumed to assume, yet the fact that he was directed to begin his work upon the top of this steel structure after it had been finished by an independent contractor with whom he had nothing to do does have a bearing on the question of his contributory negligence and the duty of his employer when ordering him to begin work at such a place.

So far as the record discloses Butler was the only representative of defendant on the premises in authority. He was in charge of and superintending the work it was doing; notice could only be given to this corporation by notice to its authorized representative or agent in the line of that to which the notice related.

The testimony tends to show that his position was such that notice to him of this defect in the steel work was notice to defendant. There is evidence that he was notified of it and disregarded the notice. There is no evidence on which to base a claim of negligence because defendant engaged inexperienced or incompetent contractors, either for the steel construction or masonry. We need not discuss the question of duty to inspect before use of the work or material of a reputable, independent contractor of experience, for inspection is but a means towards an end, and plaintiff contends that defendant's authorized representative had direct notice. Upon that issue there was evidence to carry the case to the jury. If defendant in fact had knowledge or notice of the defect which caused the accident, and neglected to take proper precautions to protect its employees, it would be responsible to them for any resulting injuries. *Devlin* v. *Smith*, 89 N. Y. 470 (42 Am. Rep. 311) ; *Mansfield Coal & Coke Co.* v. *McEnery*, 91 Pa. 185 (36 Am. Rep. 662).

Upon that branch of the case defendant's counsel requested the court to charge the jury that:

"If competent men were employed to replace the angle iron that had been removed and afterwards fell, and the Cadillac Motor Car Company had no notice that this work had been improperly performed, your verdict should be no cause of action."

This the court refused and, after giving a general definition of negligence, charged the jury in part as follows:

"You are instructed that it is the duty of the employer to furnish its employees a reasonably safe place to work. A failure to do so would be negligence.

"If you find by a preponderance of the evidence that the cause of the scaffold falling was the failure to properly replace the channel irons, then you may find that the defendant was guilty of negligence."

198—Mich.—33.

This was, in effect, direction of a verdict in favor of plaintiff upon the question of negligence, as the cause of the accident was not controverted nor denied by defendant.

At conclusion of the court's charge counsel for plaintiff suggested to the court that if the jury "should find for the plaintiff that they assess plaintiff at whatever amount barring the amount he has already received from the defendant; I think that will be the proper verdict." To which the court replied, "Yes; it should be deducted from any amount." Plaintiff's counsel then said, "The clerk can do that." This is charged by defendant as prejudicial error. It was at least confusing. Apparently there was no question as to the amount which had been paid plaintiff. He testified that at the end of a year from the time he receipted for $2,500 defendant began to pay him $45 per month and continued the same for nine months, which it is urged was in recognition of the contract of partial settlement he claims was made and his right to further compensation. If his version of the agreement and significance of the subsequent payments made to him prevailed, those payments with interest at 5 per cent. per annum should be deducted in case the damages found by the jury exceeded the total amount previously paid him. Not only were the jury uninstructed upon that subject, but the payments were liquidated amounts apparently conceded, and involved no issue of fact for the jury. To leave this matter to the jury with general instructions involving figuring interest was confusing and prejudicial to a fair determination of the issues of fact proper for the jury to pass upon.

For the foregoing reasons the judgment is reversed and a new trial granted, with costs.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.